FERGUSON-DIEHL CONSTRUCTION COMPANY et al., Plaintiffs-Appellees, v. KENNETH LANGLOSS, defendant and cross-petitioner, Appellant; ROBERT VAN DER MEIDE, defendant to cross-petition, Appellee.

No. 47132.

(Reported in 30 N. W. 2d 320)

January 13, 1948.

Rehearing Denied March 12, 1948.

C. J. Delbridge, of Sioux Falls, South Dakota, and Harper, Sinclair, Gleysteen & Nelson, of Sioux City, for appellant.

Shull & Marshall, of Sioux City, Van Oosterhout, Te Paske & Reus, of Orange City, and Maurice Te Paske, of Sioux Center, for appellees.

Smith, J.—Did the trial court err in setting aside verdicts and granting new trial? That is the sole, but difficult, question on this appeal.

The collision (November 8, 1945) was between a truck belonging to plaintiff construction company (hereinafter referred to as the company) and an auto belonging to and driven by defendant Langloss, the appellant. Plaintiff George De Vries was a passenger on the truck and Robert Van Der Meide was its driver. The latter was brought into the case as defendant to the cross-petition of defendant Langloss, who also counterclaimed against the company.

348

It will be seen there were in fact several actions: The company sought property damage against Langloss (herein called defendant) for injury to its truck; De Vries, by next friend, claimed damages against him for personal injuries; and defendant himself, by counterclaim and cross-petition, demanded damages for injury to his person and property from the company and Van Der Meide, owner and driver respectively of the truck.

Issues were joined in all these actions with familiar allegations of negligence and freedom from contributory negligence. At the close of the evidence the only motion to direct was one made by defendant, in the action by the company against him. The only ground therein urged was that the company had not shown its freedom from contributory negligence. The motion was overruled and no error is assigned on the ruling. We must, conclude all parties (except defendant) considered the evidence sufficient to go to the jury on all issues in all the actions. A reading of the record clearly supports this conclusion.

Seven forms of verdict were submitted with the instructions: (1) For the company in its action against defendant (2) for defendant on his counterclaim against the company (3) for defendant in the company's action against him (4) for plaintiff De Vries in his action against defendant (5) for defendant in the action against him by plaintiff De Vries (6) for defendant on his cross-petition against Van Der Meide, and (7) for cross-defendant Van Der Meide on said cross-petition.

Approximately four and one-half hours after submission the jury tendered verdict No. 2 with damages assessed at $7,669 in favor of defendant and against the company. This, of course, would dispose of Nos. 1 and 3. After being sent back to complete its work it later returned and tendered verdict No. 5 in favor of defendant on the claim of plaintiff De Vries against him, making No. 4 unnecessary. Again the trial court sent the jury back calling attention to the fact that no decision had been made as to defendant's cross-action against Van Der Meide, driver of the company's truck. A short time later it returned with verdict No. 6 duly signed awarding defendant damages of $7,669 in his cross-action against Van Der Meide.

The net result was verdict for defendant in the original actions against him by plaintiffs and in his favor on his counter-claim against the company and his cross-action against Van Der Meide in the sum of $7,669. The verdicts were entirely consistent with each other and with a determination that Van Der Meide's negligence, and no contributing negligence of defendant, caused the collision. There was ample evidence to support such determination. The testimony of one witness will serve to demonstrate this fact.

Frank Van Dieren, *a witness for plaintiffs,* was driving a tractor pulling a wagon going west along the highway where the collision occurred. All witnesses agree the driving conditions were somewhat treacherous due to weather conditions. Defendant, traveling the same direction, passed Van Dieren just before colliding with the company's truck coming from the west driven by Van Der Meide.

Van Dieren testified that defendant's car:

"* * * pulled onto the north side of the road in front of me so that it was on the north side of the road and heading due west and in its own lane of travel * * * within 100 feet of the front of [my] tractor. * * * After he was back on his own side of the road, he continued to go on west until the time of the collision. The point of impact must have been 250 feet to the west of my tractor. * * * Langloss was back on his own side of the highway within 100 feet ahead of me, and then traveled 150 feet beyond that point to the point of impact. There is no question in my mind but what this accident happened on the north side of the highway and that Kenneth Langloss was definitely on his own side of the road. * * *

"At the time that Langloss went 150 feet from the point where he was fully back on his own side of the road to the point of collision, the truck came at least an equal distance of 150 feet. It appeared to me that if the boys had left the brakes alone, nothing would have happened. The road was clean. It didn't appear that they applied their brakes until Langloss was over on his own side of the road.

"There was no weaving or sliding prior to that time on the part of the truck that I seen."

This is the testimony of the only disinterested eyewitness to the collision, with the possible exception of his son, who was driving a truck behind his father but did not in any way contradict this testimony.

The motion for new trial and to set aside verdicts and judgment (by plaintiffs and Van Der Meide) alleged eight grounds. The trial court overruled all except the first, which urged that the amount of damages awarded appellant was "grossly excessive and that said excessive damages appear to have been influenced by passion or prejudice * * * that the evidence * * * does not support or sustain a verdict in the amount granted * * * that the damages are clearly excessive * * *."

No contention is made here by appellees that any of the other grounds overruled by the court should be invoked in support of the ruling granting a new trial. The only questions confronting us therefore are those directly posed by the trial court's ruling, viz.: (1) Does the amount of the verdict indicate passion and prejudice; and (2) were the other circumstances mentioned by the court, in addition to the size of the verdict, sufficient to justify exercise by the trial court of its undoubted discretion to grant a new trial where it deems the trial was not fair?

I. In order properly to determine the significance of the $7,669 verdict it becomes necessary to consider the elements of damage alleged and proved. As usual, some of the elements are possible of fairly exact measurement and the evidence as to these is undisputed: Estimated total loss of net earnings for thirteen weeks, $1,014; partial loss for thirty-eight weeks, $1,216; hospital and doctor bills, $302.50; ambulance service, $17.50; and property damage to automobile, $335. These total $2,885. This leaves $4,784 to cover partial permanent disability and pain and suffering.

The difficulty of placing adequate monetary value upon pain and suffering and of estimating damage suffered by reason of partial permanent disability (estimated in the record as twenty-five per cent) is too apparent to require or justify extended discussion or citation of authority. We are not dis-

posed to say $4,700 in the instant case is of itself so excessive as to indicate passion and prejudice.

Defendant testified that when he got out of his car and attempted to walk his right leg "buckled" and would not hold his weight: "It was very painful. I felt my knee cap and it felt like it had been pushed clear up above where it belonged." He was helped into a truck and started for Hawarden about five miles away.

He says:

"My knee cap was cut up pretty bad and you could see the pieces of knee cap that looked like a 'T'. * * * I had a lot of pain, and as we drove along toward Hawarden it seemed to get worse. It was a sharp pain."

The doctor in Hawarden examined the leg and took him to Sioux City to a hospital. X-rays were taken and an operation performed under local anaesthetic:

"I suffered a sharp continual pain which seemed to be getting worse. * * * they cut into the knee and as a result of the operation, I have a scar on my knee."

The knee was shown to the jury.

The leg was put in a plaster cast covering from midway between ankle and knee to halfway up on the thigh:

"The sharp pain and ache in my leg continued all of the time * * * and after my arrival at home. I was not able to walk around on my leg and it was necessary that I have help in moving about."

At night he had to put pillows under the leg and take sedatives in order to sleep. The morning after the accident the doctor, being called about 5 o'clock, on account of the pain, cut a window in the cast. The leg had become quite swollen, causing a pressure on the cast and the pressure was causing the pain.

Defendant testified he suffered sharp pain and ache for about six weeks, during which time he took sedatives at night to obtain sleep. "I would usually sit up most of the night."

During the time the cast was on there was drainage which

continued for a week or two after the cast was taken off. He used crutches for about ten weeks in getting around while the cast was on.

Defendant was thirty-four years old and a Fuller brush salesman covering five townships in Plymouth county and the west part of Sioux county. He testified (over a year after the injury):

"I am not able at this time to carry on my business in the same fashion and manner as prior to the accident for during bad weather I am not able to get out in the country. My leg bothers me quite a lot so I can't stand too much walking. So when I have to work in town, I can't walk over three or four hours per day on account of the walking. I am not able to make as many calls out in the country for it is harder for me to get in and out of the car and it takes me longer to walk from the car to the house and I tire out a lot quicker. I never put in over eight hours a day now. It's not necessary for me to stop and adjust my leg at the present time while I'm driving my automobile for the reason that I stretch the leg out and use the other foot on the accelerator or the gas feed. This gives me more comfort and rests my bad leg. I am not able to keep my bad leg in a flexed position very long."

The testimony of defendant's wife tends to corroborate his own as to the period while he was confined to his home before and after the cast was removed. We have set out defendant's testimony at considerable length as there seemed no way effectively to brief it. The jury had a right to believe it. We find in it sufficient to absolve the jury from the imputation of passion and prejudice. The verdict may or may not be too large but we cannot say it is so large as to justify a retrial of the complex issues presented. There is in the record no indication of any circumstance or situation calculated to arouse passion or prejudice.

Citation of authorities is not very helpful here. No two injuries are accurately comparable; no two injured persons are similarly situated. The imponderables involved are peculiarly for the jury to estimate. However, see Remer v. Takin Bros. Freight Lines, 230 Iowa 290, 297 N. W. 297.

■ II. We come now to the matters (other than the mere size of the verdict) which the trial court mentions as indicative of such unfairness in the trial as to require an exercise of the "inherent power of the court to act on its own motion" to grant a retrial. There are two such circumstances mentioned:

1. "The defendant * * * with other persons and the attorneys, was in the reporter's room adjoining the court's chambers at each intermission and before and after court sessions. He was observed at such times and in the courtroom. *The difference in the appearance of injury before and after he was called to the witness stand was so obvious as to be distinctly noticeable.*" (Italics supplied.)

2. "The order in which the jury returned the verdicts of the 7 submitted to them indicated a primary desire to hold for the defendant on his counterclaim against the plaintiff construction company. It was only after the jury was twice more sent to the jury room that the necessary number of verdicts was returned."

As to the first consideration the suggestion is that defendant's testimony and demeanor on the witness stand was belied by his conduct off the stand, but in the presence of the attorneys and presumably the court, as well as "other persons" unidentified. We are told in oral argument, in effect, that defendant, on the stand, was a sort of supersalesman to the extent of misleading the jury as to the seriousness of his injury. The text of his testimony conveys no such impression.

Witnesses vary in their ability to convince, but we know of no judicial method of eliminating these differences, assuming such leveling process to be desirable. The jury system itself is usually considered the best corrective for any danger of unfairness arising therefrom.

The trial court's conclusion rests upon its observation of things that must have been seen by others, including opposing counsel. The court's thesis must include the assumption that defendant was able to and did maintain in the presence of the jury a deceptive appearance of injury which he could not, or at least did not, maintain in the presence or sight of the judge and attorneys when the jury was not present.

We think the conclusion is based upon a too uncertain premise. The possibility of error is too great for it to be the basis for overturning a jury verdict. It is to be remembered that this particular circumstance does not concern the question of *whose* negligence caused the accident but only the extent of defendant's injury for the purpose of valuing it.

The other proposition of the court, on the other hand, pertains more particularly to the question of *who* was liable. The order in which the verdicts were reached has already been stated. It is substantially the order in which the court submitted the forms. The jury felt its way cautiously through a complex legal tangle. By the aid of the court it did a logical job in that the several verdicts, when assembled, were entirely consistent with one another and with a conclusion as to the location of blame for the collision, fairly supported by, if indeed not inescapable under, the evidence. We find no indication of any special desire to "soak" the owner of the truck as a *company*, or of reluctance to charge the individual driver.

All this brings us to the crucial problem in the case: How far does the so-called "inherent right" of trial courts go in setting aside verdicts and to what extent is their exercise of the right reviewable by the appellate court? The action of the trial court here can only be sustained by according the "inherent right" practical immunity from review.

It must be conceded the language of some of our cases seems almost to go that far. However, even in some which contain the most extreme language there are danger signals which must be observed. Probably the language in Dewey v. Chicago & N. W. R. R. Co., 31 Iowa 373, 378, is as much quoted as any decision of this court on the doctrine of "inherent right." But in that case Judge Cole was constrained to add:

"But while the greatest freedom on the part of *nisi prius* judges should be exercised in setting aside verdicts, in order to secure and effectuate justice, yet judges ought to use caution in the exercise of the power so as not to invade the legitimate province of the jury when they have manifested a fair

and intelligent consideration of the evidence submitted to them, nor to injuriously protract litigation in pursuit of invariable and absolute justice in every case, for this cannot be attained."

In Hensley v. Davidson Bros. Co., 135 Iowa 106, 109, 110, 112 N. W. 227, 228, 14 Ann. Cas. 62, it is said:

"* * * the existence of the power is to enable the court to guard the rights of parties, who, for some cause, have proven unable to protect themselves * * *. *But resort to this power will rarely be required, and it should be exercised with great caution and in aggravated cases only.*" (Italics supplied.)

In In re Estate of Murray, 238 Iowa 112, 115, 26 N. W. 2d 58, 60, it is said the court has the power "after reasonable notice to the parties and opportunity to be heard."

There is nothing mysterious in this so-called "inherent power." It is in effect "a legal discretion—one that must be exercised upon sound judicial reasoning. It is not unlimited." Sparks v. Long, 234 Iowa 21, 23, 11 N. W. 2d 716, 718; Eller v. Paul Revere L. Ins. Co., 230 Iowa 1255, 1260, 300 N. W. 535.

"It has been wisely held that a large discretion is lodged in the trial court in granting new trials. That this means a sound judicial discretion, to be exercised with care, judgment, and sound discretion in the light of all the evidence and all the facts in the particular case appearing in the trial, is conceded. That courts have no right to set aside the verdict of a jury through mere caprice or whim, or to reweigh the evidence submitted, or sit in judgment on the credibility of witnesses, is too well recognized to need argument." Post v. City of Dubuque, 158 Iowa 224, 226, 227, 139 N. W. 471, 472.

We shall not attempt to review the many cases cited in the briefs. In some the power of the court is emphasized; in others, the cautionary considerations. The term "inherent," as used in this connection, does not mean "arbitrary" or "unreviewable."

It may be conceded we more readily reverse where new

356

trial is denied·than where granted. But the danger of unwarranted interference with the jury prerogative must be avoided, as well as the right to a fair and impartial trial to the litigant assured. As has been wisely said: "Everyone is entitled to a fair trial * * * but due regard for our judicial system compels that he be accorded but ·one * * *." Sparks v. Long, supra.

We are convinced that the granting of new trial here was an abuse of judicial discretion. The decision of the trial court is accordingly reversed.—Reversed.

MULRONEY, C. J., and OLIVER, BLISS, HALE, GARFIELD, MANTZ, and HAYS, JJ., concur.