Kevin WILSON, Appellant,

v.

IBP, INC., and Diane Arndt, Appellees.

No. 95–477.

Supreme Court of Iowa.

Dec. 18, 1996.

Rehearing Denied Feb. 14, 1997.

David L. Brown of Hansen, McClintock & Riley, Des Moines, and Randall J. Shanks and Laura L. Pattermann, Council Bluffs, for appellant.

Mark McCormick and Margaret C. Callahan of Belin Harris Lamson McCormick, A P.C., Des Moines, for appellees.

SNELL, Justice.

This appeal arises from an order of the district court requiring remittitur of all but $100,000 of a $15 million punitive damage award, or in the alternative, granting a new trial on the issue of punitive damages. Plaintiff-appellant, Kevin Wilson, rejected the remittitur conditions and appealed. Defendants-appellees, IBP, Inc. and Diane Arndt, cross-appealed. We affirm as modified on appeal and remand for entry of judgment or for a new trial; we affirm on the cross-appeal.

## I. Background Facts and Procedure

Plaintiff Kevin Wilson injured his back while working for defendant IBP, which is self-insured for purposes of workers' compensation. Defendant Diane Arndt is a registered nurse who was employed by IBP as manager of occupational health services for its Council Bluffs plant. In this capacity, it was Arndt's job to coordinate workers' medical care, treatment, and recovery, including overseeing work restrictions, monitoring their condition, setting up doctor's appointments, and overseeing the OSHA logs. It was Arndt who set up Wilson's appointments for treatment after his injury.

As part of its policy of seeking "conservative" treatment for injured employees, IBP sent Wilson to Dr. A.K. Argawal, who initially told Wilson to treat the injury only with rest. Eventually, Dr. Argawal assigned Wilson to light duty at the plant. Wilson, however, chose not to accept the light duty assignment and asked for a second medical opinion on his condition because he felt the treatment provided by Dr. Argawal was too conservative and ineffective. Arndt authorized a second opinion with Dr. William Hamsa, who diagnosed Wilson with an unstable disc and prescribed bed rest for him. Around the same time, IBP's corporate security department instituted a surveillance operation directed at Wilson. According to IBP, these procedures are common to ensure that workers are legitimately injured and are following their recovery instructions. The investigation involved observing Wilson's activity at home and following him in an unmarked van. Security reported to Arndt that Wilson continued to drive his children and run errands from time to time when he was instructed to be in bed.

Based on this report from corporate security, Arndt sought to have Dr. Hamsa return Wilson to light duty because of what she believed was Wilson's failure to follow the prescribed lifestyle restrictions. Arndt also informed Dr. Hamsa that IBP had a videotape showing that Wilson was not following his prescribed treatment regimen. This statement, however, was false as Arndt knew no such videotape actually existed. After this conversation with Arndt, Dr. Hamsa met with Wilson and sought to return him to light duty. Dr. Hamsa then told Wilson that he was aware Wilson had been "messing around" and was not following his prescribed treatment. Wilson testified that Dr. Hamsa accused him of lying and Dr. Hamsa subsequently discontinued his treatment. Wilson then requested that IBP refer him to a neurological surgeon who, after examination, took Wilson off light duty and performed surgery to correct his condition. Wilson never returned to work at IBP and eventually settled his workers' compensation claim against the company.

After the workers' compensation claim was settled, Wilson brought an action in district court alleging Arndt, in her statements to Dr. Hamsa regarding the non-existent videotape, slandered him and that she had violated the fiduciary duty imposed on her as an occupational health nurse at IBP. Wilson also named IBP as a defendant in the action, asserting that IBP was liable for the actions of Arndt.

The jury returned a general verdict in Wilson's favor and awarded him $4000 in compensatory and $15 million in punitive damages. After the verdict was returned, the defendants filed a motion for judgment notwithstanding the verdict (JNOV), an alternative motion for remittitur, and an alternative motion for a new trial. The court ordered a remittitur of the amount of the punitive damage award in excess of $100,000 and a new trial conditioned upon rejection of the remittitur conditions. After Wilson failed to accept the conditions of the remittitur, plaintiff and defendants moved for clarification of the new trial order. The district court entered a ruling dated March 23, 1995 specifying the grounds for the new trial:

(a) The punitive damages issue would be retried against both defendants.

(b) A new determination would be made by the jury as to whether Arndt's conduct met the standard of willful and wanton disregard for the rights and safety of another as provided in Iowa Code section 668A.1(1)(a).

(c) The jury would be asked to determine anew if IBP is liable for punitive damages on the ground of complicity under the

standard set forth in *Briner v. Hyslop*, 337 N.W.2d 858, 861–67 (Iowa 1983).

(d) The jury would be asked to determine anew whether the conduct of Arndt was directed specifically at plaintiff under the standard in Iowa Code section 668A.1(1)(b).

(e) The jury would not be instructed that the maximum punitive damage award against IBP, if any, could not exceed $100,000 (the amount set by the trial court in remittitur).

It is from these court orders that plaintiff appeals and defendants cross-appeal.

## II. Issues on Appeal

Plaintiff claims the trial court abused its discretion in ordering a new trial based on excessive punitive damages. The trial court reasoned that the $15 million punitive damages verdict was so large and disproportionate to the plaintiff's actual damages that it was grossly excessive and likely the result of passion or prejudice on the part of the jury. Plaintiff claims further error in the court's ordering a remittitur of all punitive damages assessed that exceed $100,000.

Defendants, as cross-appellants, claim error in not finding exclusive jurisdiction in the Iowa Industrial Commissioner on the issue of fiduciary duty and in submitting it to the jury. Error is also claimed in submitting the issues of defamation, compensatory damages, and punitive damages, in finding the jury verdict unambiguous, and in not granting a new trial on all issues.

## III. Breach of Fiduciary Duty

### A. Subject Matter Jurisdiction

■ Defendants challenge the validity of Wilson's claim for breach of fiduciary duty and the resulting jury verdict in Wilson's favor. They contend this claim falls within the exclusive jurisdiction of the industrial commissioner and thus was not properly brought before the district court. We disagree.

■ Our review of proceedings concerning subject matter jurisdiction is at law. *S.S. v. Iowa Dist. Ct.*, 528 N.W.2d 130, 132 (Iowa 1995); *Tigges v. City of Ames*, 356 N.W.2d 503, 512 (Iowa 1984). Our scope of review is for correction of errors at law. Iowa R.App.P. 4.

■ An action involving compensation for Wilson's physical injury suffered while employed at IBP was commenced as a workers' compensation proceeding under chapter 85 of the Iowa Code and was settled prior to trial. The issues involved at trial and here on appeal are independent of Wilson's initial physical injury. IBP's status as a self-insured employer for workers' compensation subjects it to liability as an insurer. *Reedy v. White Consol. Indus., Inc.*, 503 N.W.2d 601, 602–03 (Iowa 1993).

■ The provisions of the workers' compensation act are intended to be "the exclusive and only rights and remedies of [an] employee ... at common law or otherwise ... against ... [his or her] employer...." Iowa Code § 85.20 (1995). We have previously recognized that where no adequate remedy is provided by the Iowa workers' compensation act, then an injured worker's claim falls outside of the exclusivity provision. *See Boylan v. American Motorists Ins. Co.*, 489 N.W.2d 742, 744 (Iowa 1992) (establishing independent bad faith tort liability for insurers because workers' compensation act does not provide an adequate remedy); *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (recognizing first-party bad faith tort claims "to provide the insured an adequate remedy for an insurer's wrongful conduct."); *see also* 1A Larson, *Workmen's Compensation Law* § 48.34(a) (1994). Wilson's claims for breach of fiduciary duty and defamation, as intentional torts, fall outside the scope of the remedies available under the workers' compensation act.

Defendants attempt to frame the intentional tort claims as a general dispute involving Wilson's overall dissatisfaction with the care he received. The record, however, does not support this construction of Wilson's claim. Although there was some dispute over IBP's habit of practicing "conservative care," the gravamen of Wilson's complaint involves alleged intentional torts committed by Arndt in the period preceding and during his treat-

ment. Thus, this case is not a simple issue of dissatisfaction with care as defendants suggest.

IBP notes it has a right to choose the care it provides (including its aggressiveness) and that injured workers who are dissatisfied with their care have an exclusive remedy with the industrial commissioner pursuant to Iowa Code section 85.27. *See Harned v. Farmland Foods, Inc.*, 331 N.W.2d 98, 99 (Iowa 1983). The district court, however, was correct in distinguishing the facts in *Harned* from the case at bar. We find it significant that the facts in *Harned* "suggest plaintiffs' claim was simply one of failure to provide requested care. There is nothing to indicate an intentional tort." *Id.* at 101. Here, the district court found that Wilson's claims for breach of fiduciary duty and slander are torts independent of chapter 85 and thus do not fall within the exclusive jurisdiction of the industrial commissioner. We agree. Whatever their merit or lack thereof, both of the alleged intentional torts are cognizable, if at all, outside the scope of the workers' compensation act. Thus, the district court properly exercised subject matter jurisdiction over these questions.

### B. Sufficiency of the Evidence

Defendants next contend that Wilson failed to create a jury issue on the existence of a fiduciary relationship between himself and defendant Arndt. Accordingly, defendants assert that a JNOV should have been ordered by the court once the jury returned a verdict in Wilson's favor on this issue.

■ Sufficiency of the evidence is reviewed for correction of error at law. Iowa R.App.P. 4. A motion for JNOV should be denied if there is substantial evidence to support each element of the plaintiff's claims. *Faught v. Budlong*, 540 N.W.2d 33, 35 (Iowa 1995); *Slocum v. Hammond*, 346 N.W.2d 485, 494 (Iowa 1984). Evidence is substantial when a reasonable mind would find the evidence presented adequate to reach the same findings. *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990); *Grinnell Mut. Reins. Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988); *see also Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 283 (Iowa 1981)

("If reasonable minds could differ on the issue it was properly submitted to the jury.").

■ When considering a motion for judgment notwithstanding the verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is directed. *Watson v. Lewis*, 272 N.W.2d 459, 461 (Iowa 1978). In reviewing the propriety of the district court's ruling on such a motion, we view the evidence in the same manner. Accordingly, we must determine whether there is sufficient evidence to generate a jury question. *Id.* at 463. As we have previously noted,

> [I]f there is substantial evidence to support the claim or defense, the motion for directed verdict or for judgment notwithstanding the verdict should be denied. Conversely, without such evidence, a directed verdict or judgment notwithstanding the verdict is appropriate.

*Valadez v. City of Des Moines*, 324 N.W.2d 475, 477–78 (Iowa 1982).

■ In considering defendants' claims regarding the sufficiency of the evidence to generate a jury question, we must examine the nature of a fiduciary or confidential relationship. We have defined a fiduciary relationship in the following manner: "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted that

> a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

*Hoffman v. National Med. Enters., Inc.*, 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman*, 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962)).

Defendants suggest that the critical factor in determining the existence of a fiduciary relationship is domination and control. Although domination and control are significant factors, neither are determinative by themselves. Rather, we are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.

The record indicates that Arndt was responsible for directing and managing Wilson's medical care, including scheduling medical appointments and suggesting courses of treatment. Arndt also contacted Wilson's doctor to request that he be assigned light duty and instructed Wilson that he was required to seek care from IBP's doctors and could not choose his own physician. The resulting relationship between Arndt and Wilson could reasonably be interpreted as involving a degree of domination, even though Wilson also had the freedom to seek alternative treatments.

Significantly, Arndt testified that her first loyalty was to Wilson as an employee of IBP, and not to IBP as a company. This suggests that there was a certain amount of trust that created a confidential relationship. This is the type of relationship contemplated in *Hoffman.* Employees at IBP placed confidence in Arndt to provide for treatment of their injuries. Evidence that Arndt was dishonest in her dealings with IBP employees could reasonably constitute a "betrayal of trust and abuse of confidence." In viewing the evidence in the light most favorable to the verdict, we find that there was sufficient evidence to generate a jury question on this issue and to support the verdict in Wilson's favor.

## IV. Defamation/Slander

### A. Sufficiency of the Evidence

Wilson's second intentional tort claim alleges that Arndt's statements to Dr. Hamsa regarding Wilson's alleged failure to follow Dr. Hamsa's advice and the non-existent videotape were defamatory because they injured his reputation and character, particularly in the eyes of Dr. Hamsa. The jury found for Wilson and awarded damages. Defendants contend the district court erred by not ordering a JNOV on Wilson's claim of defamation. We disagree.

As we have noted, "[t]he gist of an action for libel or slander is the publication of written or oral statements which tend to injure a person's reputation and good name.... Slander generally consists of the oral publication of defamatory matter." *Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994). Certain statements can be characterized as slander per se. "Words are libelous per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have a libelous effect." *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 116 (Iowa 1984) (citing *Haas v. Evening Democrat Co.,* 252 Iowa 517, 522, 107 N.W.2d 444, 447 (1961)). Thus, statements categorized as slander per se are actionable without proof of malice, falsity, or special harm. *Spencer v. Spencer,* 479 N.W.2d 293, 296 (Iowa 1991); *Vinson,* 360 N.W.2d at 115–16. In addition, we have recognized that "[s]landerous imputations affecting a person in his or her business, trade, profession, or office are also actionable without proof of actual harm." *Lara,* 512 N.W.2d at 785.

Here, the district court did not determine whether Arndt's statements were slander per se, but instead left it to the jury to consider the nature of Arndt's communication with Dr. Hamsa. In assessing whether the slander issue should have been submitted to the jury, we need only decide whether the statement could be understood as slanderous per se. *See Vinson,* 360 N.W.2d at 116 ("Because defendants assert the slander claim should not have been submitted at all, we need decide only whether the statement could reasonably be understood as slanderous per se.").

We find that a reasonable juror could interpret Arndt's statements as constituting slander per se. Iowa law is clear that "[a]n attack on the integrity and moral character of a party is libelous per se." *Id.; see also Shaw Cleaners & Dyers v. Des Moines*

*Dress Club,* 215 Iowa 1130, 1137, 245 N.W. 231, 234 (1932). Arndt's statements to Dr. Hamsa regarding Wilson's alleged untruthfulness about his condition and the non-existent videotape could be reasonably understood as imputing dishonesty to Wilson and as an attack on his integrity and moral character. Thus, under the standards of review enunciated above, this issue was properly submitted to the jury to determine whether Arndt's statements constituted slander per se. Furthermore, sufficient evidence also exists to support the jury's finding that Arndt's statements were defamatory.

### B. Substantial Evidence of Damages

Defendants further argue that Wilson failed to present substantial evidence of damages from Arndt's alleged slanderous communication to Dr. Hamsa. Slander per se, however, is actionable without proof of damage. *Lara,* 512 N.W.2d at 786; *Rees v. O'Malley,* 461 N.W.2d 833, 839 (Iowa 1990); *Vinson,* 360 N.W.2d at 115–16. Recovery is limited to "those damages which were a natural and probable consequence of the original slander or its repetition or republication." *Lawrence v. Grinde,* 534 N.W.2d 414, 418 (Iowa 1995) (quoting *Brown v. First Nat'l Bank,* 193 N.W.2d 547, 555 (Iowa 1972)); *see also Rees,* 461 N.W.2d at 839. There is no indication in the record that the jury awarded ordinary damages above and beyond that permitted by this standard.

Wilson's testimony sufficiently met the requirement that the jury "be presented with evidence upon which the consequences of the [slander] can be judged, evidence such as the nature of the plaintiff's reputation before the libel was published and the extent of the publication." *Rees,* 461 N.W.2d at 839 (citing *Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 300 (Iowa App.1985)). Wilson testified that as a result of this incident, he was unable to return to work because of lack of self-esteem and distrust of his employer, and that he suffered damage to his reputation as a result of Arndt's statements. He particularly emphasized the detrimental effect the communication had on his relationship with Dr. Hamsa, who accused Wilson of lying.

Defendants' contention that Wilson's reputation before the slanderous communication was less than exemplary and that the scope of the publication was limited does not necessarily preclude a recovery. As we stated in *Rees,* "[r]equiring evidence of reputation and extent of publication is necessary so that a jury can determine the extent of injury, but is not imposing a burden on the plaintiff of proving damages." *Id.* Thus, evidence of Wilson's prior reputation is only useful in determining the amount of damages awarded, not whether they should be awarded at all as a matter of law.

After considering the evidence, the jury returned a general verdict in the amount of $4000 in compensatory damages for Wilson. The district court, in considering defendants' motion for JNOV, noted that at the very least Wilson's reputation and relationship with Dr. Hamsa were disrupted by Arndt's statements. We agree with the district court that, in viewing the record in the light most favorable to the verdict, sufficient evidence exists to support submission of the damage claim and the jury's verdict.

### C. Substantial Truth

In further defense to the defamation claim, defendants contend that Arndt's statements to Dr. Hamsa were substantially true and thus establish a complete defense to the claim. Defendants suggest that because Wilson allegedly did not follow his prescribed bed rest and that he continued to run errands and work on his car against Dr. Hamsa's orders, then Arndt's statements that Wilson was not injured as severely as he claimed and that he was not following Dr. Hamsa's orders were substantially true. But whether Wilson actually followed the exact requirements prescribed by his doctor does not affect the underlying claim. In recognizing substantial truth as a defense to a defamation action, we emphasized:

> It is no longer necessary for a libel defendant to establish the literal truth of the publication in every detail as long as the "sting" or "gist" of the defamatory charge is substantially true.

The gist or sting of the defamatory charge ... is "the heart of the matter in question—the hurtfulness of the utterance."

*Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987) (quoting *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). Thus, the literal scope of Wilson's activity is not determinative of this issue.

We agree with the trial court in that the essence of the alleged defamatory statement was that Wilson was faking the severity of his injury and was being untruthful to his doctor, *i.e.*, that he was a liar. It was not, as defendants suggest, that he was working on his car or driving his children to school. When considering the evidence in the light most favorable to the verdict, we find that there was sufficient evidence to both submit this question to the jury and to support the jury's verdict that substantial evidence of damages was present.

## V. Punitive Damages

Plaintiff, as appellant, and defendants, as cross-appellants, all complain about the handling and result of the trial court's rulings on the issue of punitive damages. The jury awarded a $15 million judgment against IBP. On posttrial motions by defendants the court reduced this amount, ordering a remittitur to $100,000. On refusal of the plaintiff to accept the remittitur conditions, the district court ordered a new trial to determine the amount of punitive damages, if any, that should be assessed against either or both defendants.

### A. Ambiguity of Punitive Damage Award

■ Defendants argue that the punitive damage award is fatally ambiguous and thus void because the jury did not identify against whom the punitive damages were awarded. We find this argument to be without merit. The district court also held that this issue goes to the form of the punitive damage jury instruction, was not timely raised by an objection, and was therefore waived. Defendants object to the court's characterization of the issue and assert the error was preserved because it concerns interpretation of the jury's verdict. Because we find the solution to this issue substantively rather than in

procedural forays, we assume defendants are correct and that error is preserved.

The trial court, in Instruction No. 24, set out the law pertaining to IBP's liability for punitive damages:

IBP, Inc. is liable for the punitive damages by reason of the acts of Diane Arndt if one of the following occurred:

1. IBP, Inc. authorized the act and the way it was done; or

2. Diane Arndt was unfit and IBP, Inc. was reckless in employing or retaining her; or

3. Diane Arndt was employed in a managerial capacity and was acting in the scope of employment; or

4. IBP, Inc. ratified or approved the act.

After receiving this and other instructions, the jury returned a verdict in Wilson's favor, along with answers to special interrogatories, that indicated punitive damages were warranted and that IBP was to be held liable for them. The verdict read as follows:

We, the Jury, find in favor of the Plaintiff, Kevin Wilson and fix the amount of his recovery against the Defendants at $4,000.00 for compensatory damages.

. . . .

### Special Interrogatories— Punitive Damages

Question No. 1: Do you find by a preponderance of clear, convincing and satisfactory evidence the conduct of the defendant, Diane Arndt constituted a willful and wanton disregard for the rights or safety of another?

Answer "Yes" or "No"

ANSWER <u>Yes</u>

. . . .

Question No. 2: What amount of punitive damages, if any, do you award?

ANSWER $<u>15,000,000.00</u>

. . . .

Question No. 3: Was the conduct of the defendant, Diane Arndt directed specifically at Kevin Wilson?

Answer "Yes" or "No"

ANSWER <u>No</u>

Question No. 4: Is IBP, Inc., as the employer of Diane Arndt, liable for punitive damages as explained to you in instruction number _____?

Answer "Yes" or "No"

ANSWER <u>Yes</u>

■ We have said "[i]t is fundamental that a jury's verdicts are to be liberally construed to give effect to the intention of the jury and to harmonize the verdicts if it is possible to do so." *Hoffman,* 442 N.W.2d at 126. Only where the verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside. *Id.* at 127. Reading the instructions as a whole (as the court instructed the jury to do), and in connection with the jury's answers on the special interrogatory verdict forms, leads to the conclusion that IBP was to be solely liable for any punitive damages awarded based on the conduct of defendant Arndt. As support for this determination, no specific punitive damage award was directed against Arndt. The trial court did not err in finding there was no ambiguity and that the punitive damage award was against IBP alone.

### B. Sufficiency of the Evidence

■ On cross-appeal, defendants claim that insufficient evidence was presented to support the submission of Wilson's punitive damage claim. The evidence to support an award must be clear, convincing and satisfactory. *See* Iowa Code § 668A.1(1)(a). The specific conduct that will support an award of punitive damages is that which establishes a "willful and wanton disregard for the rights or safety of another." *Id.* Only evidence that is relevant to the underlying wrong for which liability is imposed can support an award of punitive damages. *Burke v. Deere & Co.,* 6 F.3d 497, 511 (8th Cir.1993).

In reviewing the evidence to determine if defendants' motion for a directed verdict on the issue of sufficiency of the evidence should have been sustained, we view the evidence in the light most favorable to the party resisting the motion, *i.e.,* plaintiff Wilson. Iowa R.App.P. 14(f)(2); *Hockenberg Equip. Co. v.*

*Hockenberg's Equip. & Supply Co.,* 510 N.W.2d 153, 156 (Iowa 1993).

The trial court gave Instruction No. 22 on the general law of punitive damages:

Punitive damages may be awarded if the plaintiff has proven by a preponderance of clear, convincing and satisfactory evidence that Diane Arndt's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff.

Punitive damages are not intended to compensate for injury but are allowed to punish and discourage the defendant and others from like conduct in the future.

There is no exact rule to determine the amount of punitive damages, if any, you should award. In fixing the amount of punitive damages, you may consider all the evidence including:

1. The nature of the defendant, Diane Arndt's conduct.
2. The amount of punitive damages which will punish and discourage like conduct by the defendants in view of their financial condition.
3. The plaintiff's actual damages.

Instruction No. 9 instructed the jury that: Conduct is willful and wanton when a person intentionally does an act of an unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow.

The evidence showed that Wilson was diagnosed at his first visit to Dr. Hamsa, an orthopedic doctor, as having an unstable disc in his spine. Diane Arndt knew of the injury and admitted that it was legitimate. She also acknowledged that Wilson was experiencing pain, but later told other nurses that he was exaggerating and that as a nurse, she could tell there was nothing wrong with him. When she heard that Dr. Hamsa had ordered Wilson to take at least two weeks off work, her response was, "We'll see about that."

Dr. Hamsa conferred with Arndt after an examination on April 26, 1991, and said that he would refer Wilson to a neurosurgeon if Wilson's condition did not improve in three weeks. Less than two weeks after learning of the possible recommendation for surgery,

Arndt telephoned Dr. Hamsa to tell him that IBP had videotaped Wilson "working on his car and out doing other activities without any apparent distress." No such videotape existed and Arndt knew this was a lie. The plant's workers' compensation coordinator, Karen Beam, testified that Arndt told Dr. Hamsa the story about the videotape in order to prejudice him against Wilson. In fact, Arndt felt her call "assisted" in the doctor's decision to return Wilson to light duty status.

Other evidence indicated that Arndt had an openly low opinion of workers, referring to them as "idiots" and "jerks." She made remarks to doctors that other injured IBP workers were lying about their injuries. Evidence of this type included her statements that "this guy's a crybaby," and "this guy's full of shit." Though warned by a nurse colleague that interfering with medical treatment "seemed an awful dangerous thing to do," Arndt's response was that she did not think Dr. Hamsa would mention their conversations. Diane Arndt knew that Dr. Hamsa trusted her to provide him with truthful and accurate information, yet she admitted making up the story about the videotape. Karen Beam also testified that she was asked by Arndt to make up a story that somehow Kevin Wilson's case got confused with somebody else's case where there was a video of the other person.

Arndt had another reason for responding to worker's injuries as she did. IBP had a financial incentive program, somewhat disingenuously called "the safety award system," whose goal was to keep workers on the job. As part of the safety award system, IBP recorded the number and severity of injuries and the number of work days missed by employees due to work-related injuries. Employees of the division with the lowest injury statistics received gifts or extra year-end bonuses. Through its financial incentives, the safety award system provided strong motivation for management to reduce the number of lost time days.

IBP had a practice of getting injured employees to punch in at work and then sending them home, but allowing the employee's supervisor to record the employee as having worked a full day. Since IBP's policy was not to count these partial days as lost time days, the statistics for that IBP division looked favorable for purposes of the safety award system. Kevin Wilson was told to come to work to punch in just three days after he ruptured a disc in his spine. Other workers had been told by IBP to report to work the same day they were scheduled for surgery, or the day after having had a finger amputated.

IBP was also required to keep records of lost time days in order to comply with OSHA regulations. As with the safety award system, IBP's practice was not to report partial days as lost time days even when the employee came in just long enough to punch in. IBP's management was aware of, and participated in, this practice. Additionally, IBP had a computer system that determined whether a given injury was recordable under OSHA regulations. With some regularity, the nurses at IBP, including Diane Arndt on many occasions, entered erroneous information into the system to deceive it. As a result, the system would classify what should have been a recordable injury as non-recordable.

Any injury requiring surgery received extra attention from IBP because these injuries were typically expensive and frequently resulted in a worker being assigned a disability rating which can be expensive in and of itself. In exercising its right to choose the treating physician in workers' compensation cases, IBP looked for ultra-conservative physicians—those who disliked surgeries. IBP had referred Kevin Wilson to two ultra-conservative doctors, as well as a third doctor who said there was nothing wrong with Kevin before he saw a doctor who recommended surgery. IBP's referral to the last physician, came only after IBP became aware that Wilson had contacted an attorney concerning his treatment by IBP.

From the evidence in this record, a reasonable juror could have found the following: Diane Arndt lied to Dr. Hamsa to keep him from referring Wilson to a neurosurgeon, that IBP and Arndt would profit financially by getting workers back to work quickly (via IBP's safety award system), and that Arndt maliciously manipulated Wilson's medical

treatment for personal profit, knowing that he had an unstable disc in his back. A reasonable juror could conclude from this evidence that Arndt's conduct constituted a willful and wanton disregard of the rights and safety of Wilson.

A reasonable juror could also have found as follows: IBP actively sought ultra-conservative physicians to avoid surgery costs; it hired a staff of investigators to spy on injured employees, one of whom looked into Wilson's apartment windows; workers who were uncooperative in the company's planned medical treatment were assigned by Arndt to a light duty job, watching gauges in the rendering plant, where they were subjected to an atrocious smell while hog remains were boiled down into fertilizers and blood was drained into tanks.

This climate of suspicion toward the legitimacy of injuries to workers and their treatment, well known to Arndt, could be found by a reasonable juror to corroborate a finding of willful and wanton disregard for the rights and safety of Wilson. We find the evidence sufficient under the judicial standard required to submit this issue.

### C. Amount of Punitive Damage Award and New Trial Order

Both parties raise issues stemming from the trial court's order granting a new trial. Plaintiff argues for a reinstatement of the jury verdict or a remittitur that properly reflects IBP's degree of culpability. Defendants ask for a judgment notwithstanding the verdict on punitive damages, a new trial on all issues, or an affirmance of the trial court's order granting a new trial on punitive damage claims. Our resolution in this division will answer these questions.

### 1. Scope of Review

The new trial ordered by the trial court in the instant case was based on the court's inherent power to grant a new trial where the verdict fails to administer substantial justice between the parties. In *Lehigh Clay Products v. Iowa Department of Transportation*, 512 N.W.2d 541, 543–44 (Iowa 1994), we said:

Iowa has long recognized the trial court's inherent power to grant a new trial where the verdict fails to administer substantial justice. The trial court is not limited to the grounds for granting a new trial specified in Iowa Rule of Civil Procedure 244.

Our scope of review of this issue is for correction of errors at law. Iowa R.App.P. 4. Although the trial court has discretion in ruling on a motion for new trial, that discretion is not unlimited. *Ladeburg v. Ray*, 508 N.W.2d 694, 696 (Iowa 1993). On appeal, we review this issue on the standard of abuse of discretion. Iowa R.App.P. 14(f)(3).

The trial court's discretion can be exercised only for sound judicial reasons. *Jacobsen v. Gamber*, 249 Iowa 99, 102, 86 N.W.2d 147, 149 (1957); *Ferguson–Diehl Constr. Co. v. Langloss*, 239 Iowa 346, 355, 30 N.W.2d 320, 324 (1948). It must not be exercised arbitrarily. *Riley v. Wilson Concrete Co.*, 184 N.W.2d 689, 690 (Iowa 1971). For a trial court to grant a new trial in the interest of justice, it must have some support in the record for doing so. *Kaiser v. Stathas*, 263 N.W.2d 522, 525 (Iowa 1978). Courts have no right to set aside a jury verdict through mere caprice or whim, or to reweigh the evidence submitted, or to sit in judgment on the credibility of witnesses. *Ferguson–Diehl*, 239 Iowa at 355, 30 N.W.2d at 324. We are obligated to view the evidence in the light most favorable to the jury verdict. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 422 (Iowa 1977).

### 2. Development of United States Supreme Court Decisions

Although neither party mounts a constitutional challenge to the award, we are now obligated as a matter of constitutional law to assume the responsibility for reviewing the appropriateness of the size of punitive damage awards. *Ezzone v. Riccardi*, 525 N.W.2d 388, 398–99 (Iowa 1994). Citing *Honda Motor Co.*, we took as a directive in *Ezzone* to order a remittitur if appropriate. *Id.* at 399 (citing *Honda Motor Co. v. Oberg*, 512 U.S. 415, ———–———, 114 S.Ct. 2331, 2338–41, 129 L.Ed.2d 336, 346–51 (1994)); *see also Atlas Food Sys. & Servs., Inc. v. Crane*

*Nat'l Vendors, Inc.,* 99 F.3d 587, 593 (4th Cir.1996).

In recent years the United States Supreme Court has decided several cases giving guidance to the courts on punitive damage issues. In *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), insureds brought an action against a life insurance company and its agent for fraud. The Supreme Court affirmed a judgment against the agent and company for $200,000 in compensatory and over $840,000 in punitive damages. The Court held that imposing liability on the insurer based on the doctrine of respondeat superior did not violate the insurer's due process rights under the Fourteenth Amendment to the United States Constitution. The Court noted that punitive damages have long been a part of traditional state tort law. Blackstone noted their use in 3W. Blackstone, Commentaries 137–138. *See also Wilkes v. Wood,* Lofft 1, 98 Eng. Rep. 489 (C.P.1763) (the Lord Chief Justice validating exemplary damages as compensation, punishment and deterrence).

In determining that the common law method of assessing punitive damages met constitutional muster, the Court said: "If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Haslip,* 499 U.S. at 17, 111 S.Ct. at 1043, 113 L.Ed.2d at 19. Nevertheless, the Court warned that unlimited jury or judicial discretion in fixing punitive damages "may invite extreme results that jar one's constitutional sensibilities." *Id.* No mathematical bright line can be drawn between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. *Id.* General concerns of reasonableness and adequate guidance from the court when a case is tried to a jury, however, do enter into the constitutional calculus. *Id.* A jury "must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." *Id.* at 19, 111 S.Ct. at 1044, 113 L.Ed.2d at 21. As long as the discretion is exercised within reasonable constraints, due process is satisfied. *Id.*

Answering the charge that too little structure is given by a trial court to a jury in these general maxims, the Supreme Court said:

The discretion allowed under Alabama law in determining punitive damages is no greater than that preserved in many familiar areas of the law as for example, deciding "best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish.

*Id.*

The Supreme Court also requires additional checks by an appellate court. *Id.* These were satisfied by the Alabama Supreme Court that undertook comparative analysis, applied detailed substantive standards and ensured that the award does not exceed an amount that will accomplish society's goal of punishment and deterrence. *Id.* Constitutional impropriety was held not to have been crossed in *Haslip,* though the punitive award was four times the amount of compensatory damages, 200 times more than the insured's out-of-pocket expenses, and much in excess of any fine for insurance fraud that could be imposed.

A $19,000 actual damage and $10 million punitive award was affirmed by the Supreme Court in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The lawsuit was based on a common law action for slander of title. Quoting the *Haslip* guides, the Court concluded that the punitive damage award was not so grossly excessive as to be beyond the power of West Virginia and was consistent with the Due Process Clause. *Id.* at 462, 113 S.Ct. at 2722, 125 L.Ed.2d at 382. On the disparity between the actual and punitive damages, the Court observed that both state supreme courts and the United States Supreme Court have eschewed an approach that concentrates entirely on the relationship between them. *Id.* at 460, 113 S.Ct. at 2721, 125 L.Ed.2d at 380–81. The Supreme Court also observed that in calculating punitive damages it is appropriate to consider "whether there is a reasonable relationship between the punitive damages

award and *the harm likely to result* from defendant's conduct as well as the harm that actually has occurred." *Id.* at 460, 113 S.Ct. at 2721, 125 L.Ed.2d at 381. *See also BMW of North America, Inc. v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809, 830 (1996).

Reiterating that meaningful judicial review of punitive damage awards is required by the Due Process Clause, the Supreme Court reversed an award as unconstitutionally obtained in *Honda Motor Co. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). There, the Court held an amendment to the Oregon constitution that limited judicial review violated the Due Process Clause of the Fourteenth Amendment. *Honda Motor Co.,* 512 U.S. at 434–36, 114 S.Ct. at 2342–43, 129 L.Ed.2d at 350–53.

In *BMW,* a punitive damage award of $2 million was reversed as violative of the Due Process Clause because of the low level of reprehensibility of conduct and a 500:1 ratio between the award and actual harm done to the purchaser. *BMW,* —— U.S. at ——, 116 S.Ct. at 1598–99, 134 L.Ed.2d at 825–27. The actual harm arose from the purchase of a new BMW car that had been repainted without the knowledge of the purchaser. The Court noted that none of the aggravating factors associated with particularly reprehensible conduct was present. *Id.* at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. The harm done to plaintiff Gore was purely economic in nature. Stressing the degree of reprehensibility the Court said:

> Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of the offense."

*Id.* at ——, 116 S.Ct. at 1599, 134 L.Ed.2d at 826. Comparing this ratio of actual damages to punitive damages, the Court found the disparity to be dramatically greater in *BMW* than in the *Haslip* and *TXO* cases. Expanding on this factor, the Court said:

> Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for ex-

ample, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id.* at ——, 116 S.Ct. at 1602, 134 L.Ed.2d at 831.

In a case decided while *BMW* was pending, the Eighth Circuit found that a 250,000:1 ratio between punitive and actual damages was excessive and violative of due process. *Pulla v. Amoco Oil Co.,* 72 F.3d 648 (8th Cir.1995). The case involved Amoco's intrusion on the privacy of its employees by accessing their credit card records to check on use of sick leave. The $500,000 punitive damage award was reversed, the court viewing the event as a one-time occurrence that justified a limited award of punitive damages. The touchstone, the court emphasized, is the potential harm that would have likely resulted from the dangerousness inherent in defendant's actual conduct. *Id.* at 659.

A federal district court has since followed the rationale of *BMW* in *Schimizzi v. Illinois Farmers Insurance Co.,* 928 F.Supp. 760 (N.D.Ind.1996). It found a punitive award of $600,000 was excessive where the actual damages were $45,000 and that Farmer's conduct did not rank high on the reprehensibility scale. Even so, the court found that the jury intended to award a significant amount in punitive damages, and fixed punitive damages at $135,000.

Recently, the United States Court of Appeals, Fourth Circuit, commented on the relationship between the jury's verdict and the trial court's judgment in assessing punitive damages. *See Atlas Food Sys. & Servs., Inc.,* 99 F.3d at 595. In the first trial, the jury's award of $3 million in punitive damages was reduced by the trial judge to $1 million by a remittitur order or a new trial would be granted. *Id.* at 591. On rejection by the plaintiff, a second trial was ordered which resulted in a jury verdict of $4 million in punitive damages, which was again reduced by the trial judge who entered a remittitur order setting the punitive damages

award at $1 million or a new trial would be granted. *Id.* The federal circuit court held that the trial court had not abused its discretion, stating:

> The court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice.

*Id.* at 595.

### 3. Development of Iowa Case Law

Our court has a long history of considering punitive damage cases. Recent cases have set out principles that track with the pronouncements of the Supreme Court, discussed in this opinion. In *Ryan v. Arneson*, 422 N.W.2d 491 (Iowa 1988), we compared an actual award of $120 to a punitive damage award of $18,600. Holding the punitive award was not excessive, we said:

> We have stated that punitive damages must be reasonably related to actual damages. Recent cases, however, have held that punitive damages may be awarded even if actual damages were shown but never awarded. These cases show that our primary focus in review of a punitive damage award is the relationship between the punitive damage award and the wrongful conduct of the offending party.
>
> . . . .
>
> Although Iowa cases have discussed a relationship between actual and punitive damages, this court has expressly rejected the use of a mathematical ratio in examining punitive damages. Furthermore, Iowa cases have stated that legal precedent is of limited value in evaluating the damage award of a specific case.
>
> In determining whether punitive damages are so excessive that they demonstrate passion and prejudice on the part of the jury, we will consider whether the punitive damage award is reasonably related to the malicious conduct of the defen-

dant which resulted in actual injury or damage to the plaintiff.

*Ryan,* 422 N.W.2d at 496.

In 1994, we decided *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854 (Iowa 1994). In this case we approved a punitive award as not being violative of due process protections, double jeopardy, or excessive fines charges. *Spaur,* 510 N.W.2d at 866–69. The awards for injuries from asbestos-containing products were $1.4 million in compensatory and $1.5 million in punitive damages. We quoted the standards of *Haslip* and applied them on the posttrial review process. *Id.* at 867.

■ Also in 1994, we had occasion to again consider a punitive damage award in *Ezzone,* 525 N.W.2d at 398–99. The suit involved an action against a bank for interference with shareholders' rights. Citing the Supreme Court case of *Honda Motor Co.* as establishing due process requirements, we structured our review process as follows:

> This and future reviews will be conducted on the basis of principles previously announced in punitive damages cases. Awards will be tested with a view of the extent and nature of the outrageous conduct, the amount necessary for future deterrence, and with deference to the relationship between the punitive award and plaintiff's injury, as reflected in any award for compensatory damages. In addition to these traditional factors, we shall consider all circumstances surrounding the conduct and relationship between the parties. Any provocation of the conduct by plaintiff will be a factor. We take the provocation to include participation in the conduct complained of.

*Ezzone,* 525 N.W.2d at 399 (citing Restatement (Second) Torts § 908 cmt. e (1979)). Accordingly, the aforementioned cases provide us with guidance in reviewing the appropriateness of Wilson's punitive damage award.

### 4. Amount of Punitive Award

Applying these tests to the facts and the jury findings in the case at bar convinces us that an award of substantial punitive dam-

ages against IBP is warranted and is supported by the evidence and the law.

Arndt knowingly engaged in a malicious course of conduct that was in line with the climate established by IBP concerning its injured workers. Her conduct was an attempt to manipulate and interfere with the medical treatment received by Wilson and other injured workers. She was aware of and fostered this treatment of injured workers, knowing that a financial gain came to her and other management personnel thereby through IBP's safety award system. As part of this purpose, she participated in manipulating work records of injured employees which may have resulted in falsification of OSHA records. The extent and nature of the outrageous conduct is considerable when compared with other cases that have assessed the reprehensibility of defendants' acts.

The evidence indicated that Wilson's treatment as an injured worker was not a one-time or isolated instance. The interference with the diagnosis and treatment of his injury could have resulted in a pronounced worsening of an already serious condition. Other workers with injuries could be profoundly affected as a result of the policy actions carried out by Arndt and IBP. For these reasons, we find the future deterrence aspect of our reviewing principles to be of great importance. Of minor significance is the ratio between the compensatory and punitive damages assessed.

One of the factors approved by the Supreme Court and our court for assessing the imposition of punitive damages is the financial position of the defendant. This bears on the factor of deterring like conduct in the future, also accepted by both courts. *See Haslip,* 499 U.S. at 21, 111 S.Ct. at 1045, 113 L.Ed.2d at 22; *Spaur,* 510 N.W.2d at 867 (factors 5 and 7). IBP is the largest producer of fresh beef and pork in the world. It operates eighteen separate beef or pork plants in nine states, as well as nineteen other plants, warehouses, tanneries and refineries. The company has a sales network of ten regional and international service centers in the United States, Europe, and Asia. IBP employs 29,000 people, had net sales in 1993 of $11.6 billion and had a net worth in 1993 of $600 million.

Applying, for our posttrial review process, all of the factors listed as appropriate in *BMW, Haslip, Spaur, Ryan,* and *Ezzone,* we hold that the amount of punitive damages against IBP as found by the trial jury is excessive. Nevertheless, the assessment of substantial punitive damages against IBP is supported by this record. Accordingly, we hold that the judgment for plaintiff against defendants for $4000 in compensatory damages is affirmed; judgment for punitive damages in favor of plaintiff against defendant IBP is affirmed in the amount of $2 million if plaintiff agrees to a remittitur of all punitive damages exceeding that amount. Consistent with the statutory directive of Iowa Code section 668A.1(2)(b), as interpreted by *Fernandez v. Curley,* 463 N.W.2d 5 (Iowa 1990), this amount shall be apportioned by judgment entries as follows:

(1) For payment of applicable fees and costs, including plaintiff's reasonable attorney fees applicable to the recovery of the $2 million award, from the gross punitive damage award of $2 million.

(2) For twenty-five percent of the $2 million award in favor of plaintiff ($500,000).

(3) For the remainder of the $2 million award after satisfying (1) and (2) apportionments to the Civil Reparations Trust Fund.

The judgments shall also include interest as provided by law.

If plaintiff rejects these remittitur conditions, a new trial shall be ordered by the trial court under the conditions determined in the trial court's order of March 23, 1995, which we have described in this opinion. On the cross-appeal, we affirm except as modified by our disposition on the appeal.

We have reviewed all the issues raised by both parties and find that they are disposed of by this determination or are without merit.

Costs are assessed against defendant IBP.

**AFFIRMED AS MODIFIED ON APPEAL AND REMANDED; AFFIRMED ON CROSS–APPEAL.**