Timothy PHILLIPS, Plaintiff,

v.

SWIFT & CO., Defendant.

No. 4–99–CV–90647.

United States District Court, S.D. Iowa, Central Division.

March 14, 2001.

Christopher D. Spaulding, Des Moines, IA, for Plaintiff.

Edward N. McConnell, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

This matter is before the Court on Defendant's motion for summary judgment. Plaintiff, Timothy Phillips ("Phillips"), claims that Defendant, Swift & Co. ("Swift"), breached its fiduciary duty to him with regard to its treatment of an injury he received on the job and his resulting work restrictions. In its motion for summary judgment, Swift argues that it did not breach any fiduciary duty to Phillips and that Phillips' claim is actually preempted by Iowa's Worker's Compensation Act. While it is a difficult issue, the Court does not think that Phillips' claim is preempted by the Iowa Worker's Compensation Act. The Court also finds there is sufficient evidence for a reasonable jury to believe that Swift breached the fiduciary duty Swift admits it owed to Phillips. The Court therefore denies Swift's motion for summary judgment.

## I. FACTS

The facts, viewed in a light most favorable to the nonmoving party, are as follows. *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990) (stating that on a motion for summary judgment a court is required to view the facts in the light most favorable to the nonmoving party). Phillips began working at Swift on September 22, 1998. On September 27, 1998, while on the job he suffered a laceration to his right wrist and forearm when he made contact with a rotary fan blade. Phillips was taken to the emergency room where he was seen by

Dr. Clemons. Dr. Clemons gave him sutures, a tetanus shot, and the following work restrictions: "No use of right arm for the next 10 days. Must keep right arm dressing dry and clean."

Phillips returned to work the following day. On that day, Anna Welton ("Welton"), a nurse who was Swift's health services department manager, acknowledged Dr. Clemon's restrictions and assigned Phillips to work in the glove room handing out gloves. Phillips claims that this assignment violated his work restrictions because it was not clean. Nevertheless, Phillips continued to work there. On September 29, Phillips went to the McFarland Clinic to have his wound checked and saw physician's assistant Leanne Knoop ("Knoop"). Knoop noted the wound, "[A]ppear[ed] to have a little pus in the area" and noted, "Possible early infection." Knoop restricted Phillip's work to a "sit-down job only with right arm elevated." She also ordered the use of antibiotic ointment and the change of dressings. Welton acknowledge Knoop's restrictions and issued a supervisors slip to Phillips' supervisor, Don Johnson, which instructed that Phillips was restricted for seven days to "no use rt. Arm. Keep clean and dry." Phillips continued to work in the glove room.

On October 2, 1998, Phillips returned to Knoop who continued the same restrictions. Knoop noted, "The area looks fairly clean. There are no signs of infection." After this visit, Welton issued a supervisors slip to another supervisor, Doug Ridot, which simply stated, "No use of Rt Arm." Then, on October 5, 1998, Swift moved Phillips from the glove room to the kill floor, where he was to paint or stripe hog carcasses. Phillips claims that the environment on the kill floor was hot and humid with airborne contaminants and blood and swine organs everywhere. He says that he complained to Welton about it. He also claims that the job required him to use his restricted hand at one point. Swift claims that it sent Phillips to a part of the kill floor that was dry and clean.

Phillips continued to work on the kill floor from October 5, 1998 to October 16, 1998. On October 9, Phillips returned to the McFarland Clinic, where Knoop and Dr. Thomas removed his sutures. At that visit, Knoop recorded that the wound looked relatively clean and was healing. However, Dr. Thomas noted a wound infection and drainage. Knoop again restricted Phillips from using his right arm. On October 12, Phillips went to the health services department at Swift complaining of a gap in his laceration. Welton recorded in her notes, "Placed call to Dr. re[garding] emp[loyee]'s [ ] concerns ... Dr. reports he expected this to happen." Phillips contends that there is no reference to such a conversation in the records of Phillips' medical providers at the McFarland Clinic. Phillips went back to see Knoop and Dr. Thomas on October 15. They recorded poor wound healing and that Phillips should be referred for a surgical consultation. On October 16, Phillips saw a surgeon named Dr. Kosinski. Dr. Kosinski diagnosed Phillips with an infected right forearm wound, debrided the area, and ordered Phillips not to go back to work until told to do so.

Phillips remained off work from October 17, 1998 to November 17, 1998. During this time he underwent numerous debridements of his wound. On October 22, Dr. Kosinski referred him to a hand specialist named Dr. Friedrich because of a concern about the function of extensor tendons. On October 27, Dr. Friedrich met with Phillips and advised him against work "in a contaminated environment." Then, on November 2, Dr. Friedrich performed skin graft surgery on Phillips.

On November 17, Phillips returned to work under a restriction to only work one-handed jobs in a clean and dry environment. But then, on December 7, 1998, Swift assigned Phillips to run tickets from the barn to a box inside a door to the kill floor. Phillips refused. Swift claims Phillips refused because he had on the wrong clothing, was unable to put on his boots, wanted reimbursement for clothes he claimed were stolen from his locker, and then because the work was on the kill floor. Swift also claims that it provided plastic protective gear to cover Phillips' wound. Phillips claims that he refused in fear that he would be exposed to the same type of conditions that he thinks caused his infection, and he disputes that Phillips gave him any kind of plastic protective gear for his wound. Welton recorded in her notes that Dr. Friedrich's office approved Phillips to run tickets so long as Swift followed his work restrictions. Phillips says that Welton told him that, but he challenges whether such approval was obtained. In fact, Dr. Friedrich states that his release letting Phillips "run tickets from barn to kill floor" was not intended to allow him to go onto the kill floor or work in a dirty environment. Regardless, after refusing to perform the ticket dropping duties, Swift asked Phillips to leave. Swift then suspended him on the following day, December 8. And on December 9, 1998, Phillips quit.

Phillips initiated this lawsuit on November 16, 1999. In his complaint, he claims that Swift breached its fiduciary duty to him in the following respects:

(a) Delayed and denied recommended and necessary medical treatment;

(b) Failed to comply with the medical restrictions assigned to Plaintiff;

(c) Allowed an insufficiently trained employee to make major medical decisions with regard to the care and treatment of Plaintiff; and

(d) Knowingly and intentionally exposed Plaintiff Timothy Phillips to infection when this exposure was totally unnecessary.

Complaint and Jury Demand ¶ 12. For this, Phillips is asking for compensatory and punitive damages.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine," "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judg-

ment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

## III. DISCUSSION

This case involves the continued erosion of the bargain between employers and employees that constitutes the Iowa Worker's Compensation Act, Iowa Code § 85 *et seq.* At bottom, this case is about an employee suing his employer regarding an injury that happened at work. However, the employee here claims he is not really suing because of the original injury he suffered or even the medical treatment he received for that injury, rather he claims his lawsuit involves something quite separate. In this case, the employee claims he is suing because of the way his employer dealt with the work restrictions that arose from his injury. He claims that because his claim consists of an alleged breach of a fiduciary duty in regard to his work restrictions, under the relatively recent Iowa Supreme Court case, *Wilson v. IBP, Inc.,* 558 N.W.2d 132 (1996), his claim is outside the scope of the Iowa Worker's Compensation Act.

### A. Background on Iowa Worker's Compensation Act

A plaintiff attempting to get around the Worker's Compensation Act presents nothing new. But that is not to say that it presents an easy issue either. Over the years, the Iowa Supreme Court has defined and critiqued the Worker's Compensation Act—at times, drawing a response from the Iowa legislature. In fact, in order to fully understand the legal conundrum facing this Court as an *Erie* court thrust into the position of interpreting state law, a discussion of the Iowa Workers Compensation Act from a historical perspective is necessary. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### 1. Purpose

As an outgrowth of the progressive era, workers' compensation acts replaced the injured workers rights at common law and stripped employers of their common law defenses to injuries that arose out of, and were in the course of, workers' employment. As stated by the Iowa Supreme Court in *Secrest v. Galloway Co.,* 239 Iowa 168, 30 N.W.2d 793, 795 (Iowa 1948),

> The authorities agree that such acts are in derogation of the common law. Under their provisions, the employer on the one hand relinquishes certain defenses available to him at common law and the employee on the other hand relinquishes all right of action based upon the principles of common law.

Continuing, the Court stated:

> Under the Iowa act, there is created a system for arriving at a just settlement for injuries sustained by an employee. In place of the matter being brought in the district court, an Industrial Commissioner is created with exclusive authority, in the first instance, to determine the questions involved. Under our original Act he was vested with authority not only to make an award, but having made such award, to later review the same with power to increase, diminish or annul, as conditions might warrant. The rights to these privileges, among others, given in exchange for the release of common-law rights. These rights are, under our elective system, a part of the contract of hire. This fact, together with the purpose of the act, has brought about a policy of liberal construction.

*Id.*

The Iowa Court had earlier written about the historic purpose behind the law's enactment. In *Yates v. Humphrey,* the Court quoted the following language with approval:

The law in question was intended to relieve against the hardships resulting from the many unfortunate accidents which do take place in this age of extensive use of complicated machines and appliances, and of great enterprises necessitating the indiscriminate employment of large forces of laborers and mechanics. All question of the employer's fault or negligence is eliminated from cases arising under this act. The intention was to compensate all accidental injuries growing out of and received in the service, except those intentionally self-inflicted or due to intoxication. The statute is highly remedial in character. The courts ought therefore to guard against a narrow construction, and should not exclude a servant from the benefits thereof, unless constrained by unambiguous language or the clear intent as gathered from the entire act.

218 Iowa 792, 255 N.W. 639, 642 (Iowa 1934) (quoting *State ex rel. Duluth Brewing Co.* 129 Minn. 176, 151 N.W. 912, 913 (1915)). Even earlier the court wrote about the need to provide relatively speedy medical care and monetary benefits to injured workers and their families and to pass the cost of that along to those in the economy at large. In *Tunnicliff v. Bettendorf,* 204 Iowa 168, 214 N.W. 516, 517–18 (1927) the economic rationale for workers' compensation statutes was described as follows:

It is of the very spirit of the Workmen's Compensation Act, the fundamental idea that is its basis, that the disability of a workman resulting from an injury arising out of and in the course of his employment is a loss that should be borne by the industry itself, as an incident of operation, in a sense an item of the cost of production, and as such passed on to the consumer of the product, and not suffered alone by the workman or the employer, depending on the individual fault or negligence.

The court in *Pierce v. Bekins Van & Storage Co.,* 185 Iowa 1346, 172 N.W. 191, 192–93 (1919), also wrote of the universal application of the act and "passing on" the cost of injuries as follows:

So far, we have assumed that such an exception as the act does not contain would be beneficial. Whether it would be that is quite debatable. For one thing, it would make impossible the accomplishment of the one purpose of such acts, to wit, to bring about speedy payment by procedure at once simple and inexpensive. It would further tend to nullify another thing intended, to wit, that the employer shall be enabled to charge to the industry what injury to the employee engaged therein will cost. As to the first, compelling the employee to bring a common-law suit, and to apply to its decision the statutes of another state, is certainly not calculated to promote speedy payment by procedure simple and inexpensive. As to the second, the employer could fix no tax upon his business to meet expenditures for compensation because he would not pay statute compensation where the injury occurred outside of the state, and could not foretell what proportion of injuries to be compensated for would arise outside of the state. This, however, does not so much matter. Once grant the power to make the statute apply to injury sustained outside of the state, and that this has been done, and it becomes immaterial whether it would be injurious or beneficial to have limited the statute to the state.

The court in *Pierce* rejected the claim that an injury occurring outside of Iowa should not be covered by the Act. *Id.* at 193.

2. **Exclusivity**

With the benefit of medical care available to the injured worker, conflict arose over just what independent tort remedies

the legislature had abolished. In *Bradshaw v. Iowa Methodist Hospital*, 251 Iowa 375, 101 N.W.2d 167, 168–69 (Iowa 1960) the Iowa Supreme Court confronted the situation where the plaintiff had suffered a work injury and then during the course of his medical treatment had sustained a fall which he alleged was the result of the common law negligence of the hospital. Maytag, the employer, paid the plaintiff workers' compensation benefits during the period of his temporary disability. *Id.* at 173. Iowa Methodist, the defendant in the common law medical malpractice action contended that it could not be sued because the Workers' Compensation Act was the plaintiff's exclusive remedy. *Id.* The Iowa Supreme Court rejected the argument, stating:

> It does not follow from the fact plaintiff has the right to obtain *the statutory compensation* from Maytag for the results of his treatment by this defendant that he may not sue defendant at common law for all *the damages* caused thereby. Workmen's compensation according to the statutory scale is one thing. The right thereto does not depend upon negligence of the employer but arises from the contract of hire into which the compensation act is read. Damages at common law for the results of an injury negligently caused are quite different.
>
> Certainly plaintiff had a right of action at common law in tort against this defendant for the damages resulting from its alleged negligent treatment of him. He still has that right unless our compensation act has taken it from him. We find nothing in the act which does so. Our compensation law does not abolish common law actions in tort except those between employee and employer. The provision of section 85.20, Codes 1954, 1958, I.C.A., that the rights provided in chapter 85 for an employee on account of injury shall be exclusive of all other rights of such employee applies only to actions against the employer (Maytag here) and does not prevent an injured employee from suing third persons at common law. 101 C.J.S. Workmen's Compensation § 983, p. 459.

*Id.* at 174 (emphasis in original) (citations omitted).

■ The exclusiveness of the Act appears to prohibit extensions of the law regarding employer rights as well as employee rights. In *Williams v. Weiler & Co.*, 498 F.Supp. 917, 920 (S.D.Iowa 1979) the court in applying Iowa law refused to extend the doctrine of equitable contribution to employers. In doing so the court cited *Bradshaw* and discussed the idea behind the Workers' Compensation Act:

> This Court also chooses to follow the rule laid down in the Abild line of cases, and contribution from the Employer will not be allowed. However, this Court does not rest its decision solely on the "common liability" theory of the Abild Court. The real reason for the rule denying contribution seems to be embedded in the basic theory of the worker's compensation doctrine itself. The central concept behind worker's compensation is that the employer and employee receive the benefits of a guaranteed, fixed-schedule, non-fault recovery system, which constitutes the exclusive liability of the employer. It must be remembered that this system has nothing to do with the concepts of negligence. The doctrine of contribution, on the other hand, is based upon a finding of negligence and proximate cause. In view of this, the two concepts cannot be expected to dovetail one another.

*Id.* (citation omitted).

In construing the Act the Iowa Courts have always discussed the intent of the law as being a "liberal" one so as to be beneficial to the worker and his family. In

reversing a denial of benefits to a worker because he burned himself while using a match to light his cigarette, the court in *Rish v. Iowa Portland Cement Co.*, 186 Iowa 443, 170 N.W. 532, 534 (1919) noted the following:

> The tendency of the courts in all jurisdictions where similar acts are in force is to give a broad and liberal construction to the provisions thereof. Injuries received while the workman was engaged in ministering to himself, such as warming himself, seeking shelter, quenching his thirst, taking refreshment, food, fresh air, or resting in the shade, have been held compensable.

The Iowa Supreme Court in interpreting whether the employer should be credited with the recovery of benefits that a worker's estate received from a third party tortfeasor continued its adherence to this policy by writing in *Disbrow v. Deering Implement Co.*, 233 Iowa 380, 9 N.W.2d 378, 384 (Iowa, 1943):

> We are constrained to hold that the remedy is not one of further legislation, but rather of proper statutory construction. The Workmen's–Compensation Law was designed to aid and protect the industrial worker and his dependents against the hazards of the worker's employment, and to cast upon the industry in which he is employed a share of the burden resulting from industrial accidents. Such legislation is primarily for the benefit of such worker and his dependents. Its beneficent purpose should not be defeated by reading something into a section which is not there, or by a narrow or strained construction.

Over the years the Iowa Supreme Court had by interpretation developed a dual system of compensating injured workers for their permanent disabilities. As early as 1921, in *Moses v. National Union Coal Mining Co.*, 194 Iowa 819, 184 N.W. 746 (Iowa 1921), the treatment of permanent disability as a "scheduled" loss or an "unscheduled" loss caused much controversy. The essence of the dispute was captured by Justice McCormick of the Iowa Supreme Court in his concurring opinion in *Graves v. Eagle Iron Works*, 331 N.W.2d 116, 119–20 (Iowa 1983) when he stated:

> Workers' compensation is supposed to pay workers for industrial disability caused by covered injuries. The cases define industrial disability as reduction in earning capacity. *See McSpadden v. Big Ben Coal Co.*, 288 N.W.2d 181, 192 (Iowa 1980). In the present case, the worker's earning capacity has been drastically and permanently reduced. His problem, however, is that he has a "scheduled" injury. The schedule conclusively presumes that the effects of functional loss of a scheduled member and industrial disability are the same. See 2 A. Larson, The Law of Workers' Compensation § 58.11 at 10–174 (1981).
>
> As in the present case when the functional loss from injury to a scheduled member "is not a total functional loss, the weekly payments are made for the number of weeks that the percentage of functional loss bears to the total functional loss of such a member." Hedberg & Vonderhaar, *An Overview of the Iowa Workers' Compensation Act*, 30 Drake L.Rev. 809, 827 (1980–81). As this case illustrates, no necessary correlation exists in fact between functional loss and industrial disability. Loss of a foot will mean one thing to a person with a desk job and quite another to a person who is trained only in work requiring standing, walking and lifting. But for the fortuity that his injury was to a scheduled member, Graves would have recovered for his actual industrial disability rather than the wholly arbitrary presumed industrial disability under the schedule.
>
> The schedule brings a windfall to the worker in some cases and gross hard-

ship to the worker in others. Although it is argued the schedule has the advantage of simplicity, it is questionable whether that advantage is worth the cost. The result in the present case is indefensible except that it is demanded by an anachronistic statute.

Even with the encouragement by that opinion the law has remained unchanged with respect to the method of compensating workers with respect to permanency benefits.

The law, however, continued to be challenged and changed by both the Iowa Supreme Court and the Iowa legislature. In *Craven v. Oggero,* 213 N.W.2d 678, (Iowa 1973) the court held that while the injured worker was barred from bringing a claim against his employer for negligence, he was not barred from suing his supervisor or co-employee for negligence for injuries that arose out of and were in the course of his work activities. The court held that the co-employee (supervisor) must be responsible in some delegated manner in order to have a duty to the employee so as to authorize such suit. *Id.* at 682. The response to Craven by the Iowa General Assembly was immediate. According to a later opinion by the Iowa Supreme Court interpreting the "new co-employee gross negligence statute" in *Thompson v. Bohlken,* 312 N.W.2d 501, 504 (Iowa 1981),

that statute provides that worker's compensation is the exclusive remedy against a co-employee, "provided that such injury ... is not caused by the other employee's *gross negligence amounting to such lack of care as to amount to wanton neglect for the safety of another.*" (Emphasis added.) The emphasized portion of the statute was added in 1974, apparently in response to a decision of this court recognizing the right to sue co-employees based upon acts of "simple" negligence in breaching safety-related duties owed to co-employees.

(Emphasis in original). While changing *Craven* so as to limit possible third party claims by injured workers, the court continued to provide new remedies to injured workers in situations related to their workplace injuries.

In *Springer v. Weeks,* 429 N.W.2d 558, 560 (Iowa 1988), the court recognized for the first time a claim for wrongful discharge by a worker terminated from her employment because of her pursuit of workers compensation claim. In writing for the court, Justice Carter emphasized the importance of this public policy:

We believe a cause of action should exist for tortious interference with the contract of hire when the discharge serves to frustrate a well-recognized and defined public policy of the state. It is provided in Iowa Code section 85.18 (1987) that: "No contract, rule, or device whatsoever shall operate to relieve the employer, in whole or in part, from any liability created by this chapter except as herein provided."

*Springer,* 429 N.W.2d at 560. To deny a worker this benefit would lessen the value of his remedy of workers' compensation benefits:

We deem this to be a clear expression that it is the public policy of this state that an employee's right to seek the compensation which is granted by law for work-related injuries should not be interfered with regardless of the terms of the contract of hire. To permit the type of retaliatory discharge which has been alleged in this case to go without a remedy would fly in the face of this policy.

*Id.* at 560–61. In *Niblo v. Parr Manufacturing,* 445 N.W.2d 351 (Iowa 1989), the court expanded the *Springer* holding to include a worker like Niblo who threatened to file or wanted to file a claim but had not actually filed a claim. The court

explained the addition of emotional distress damages to claims for lost earnings as follows:

> In considering the cause of action for wrongful discharge, we believe that damages caused by mental distress may properly be considered in addition to the lost earnings caused by the termination of employment. We recognized the tort of wrongful discharge because of public policy considerations. *Springer*, 429 N.W.2d at 560–61. These considerations are similar to those expressed in the telegraph message cases of *Mentzer* and *Cowan*. A wrongful or retaliatory discharge in violation of public policy is an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. See, e.g., *Perks v. Firestone Tire & Rubber Co.*, 611 F.2d 1363, 1366 (3d Cir.1979) (discharge for failure to submit to illegal polygraph test would be actionable). We believe that public policy also requires us to allow a wrongfully discharged employee a remedy for his or her complete injury.

*Id.* at 355.

In *Tallman v. Hanssen*, 427 N.W.2d 868, 869 (Iowa 1988), a worker filed a lawsuit claiming that the insurance carrier's lawyer had defamed him by filing a brief with the Industrial Commissioner's office during the course of the proceeding. The worker also alleged in his district court petition that the carrier had refused to pay necessary medical bills. *Id.* The Iowa Supreme Court upheld the dismissal of the libel claim, holding that the proceeding before the Commissioner was a judicial one entitling the lawyer's brief to an absolute privilege and dismissed that portion of the pro se claimant's appeal. *Id.* at 870. The court characterized the plaintiff's second claim as follows: "Tallman alleged Wausau, by refusing to pay his medical bills or to provide a physician, 'willfully and knowingly caused physical damage to [him], inflicting an extreme amount of pain and mental anguish upon [him].'" *Id.* The court reversed the district court's dismissal of this claim, finding that the exclusive remedy provision in 85.20 of the act did not preclude the plaintiff from bringing a claim for bad faith. The court stated:

> It is axiomatic that an employee's rights and remedies arising from an injury suffered in the course of employment are exclusively provided under Iowa Code chapter 85. A district court would ordinarily have no subject matter jurisdiction over a claim that an employee is entitled to workers' compensation benefits. But this exclusivity principle is limited to matters surrounding a job-related injury and does not extend to subsequent dealings during which a tort may arise by reason of bad faith on the part of an employer's insurer. In *Matter of Certification of Question of Law*, 399 N.W.2d 320 (S.D.1987) the court said:
>
> > The liability sought here to be imposed upon [the insurer] does not arise out of the injury suffered by Ms. Holland on October 6,1977. It derives from the independent and allegedly intentional, tortious conduct of [the insurer] in refusing to pay benefits owing under the [Workers' Compensation] Act without an arguable basis there for.
>
> > We hold, therefore, that the exclusivity provision of the Workers' Compensation Act does not bar an action by the employee against the insurance carrier for the commission of an intentional tort. The independent tort is not compensable under our Workers' Compensation Act. . . .

*Tallman*, 427 N.W.2d at 870–71 (citations omitted).

The Iowa Court took another step forward in recognizing additional causes of

actions for injured workers in *Boylan v. American Motorists Company,* 489 N.W.2d 742 (Iowa 1992). The plaintiff alleged bad faith on the part of the employer's workers compensation carrier in denying and then terminating his benefits. *Id.* at 742. The district court dismissed his claim. *Id.* The court disagreed, stating:

In seeking to apply *Long,* the district court determined that an employer or workers' compensation insurance carrier is not required to pay weekly benefits or to pay medical service providers prior to the time the industrial commissioner has determined the employee's entitlement to benefits. We do not believe that characterization is entirely accurate.

As a result of [sic] 1982 amendments to the workers' compensation act, Iowa Code section 86.13 (1991) now provides in part:

If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the industrial commissioner shall award benefits in addition to those benefits payable under this chapter or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

1982 Iowa Acts ch. 1161, § 23. Section 86.13 does not require that the unreasonable delay or termination of benefits for which a penalty may be ordered occur after a determination of benefit eligibility by the industrial commissioner. It recognizes, at least with respect to temporary disability or healing period benefits, an affirmative obligation on the part of the employer and insurance carrier to act reasonably in regard to benefit payments in the absence of specific direction by the commissioner.

*Id.* at 742–43. The supreme court rejected the district court's reasoning that the presence of a penalty provision in the 1982 amendments to the act made it unlikely

that such a cause of action for bad faith would be recognized in Iowa:

We conclude that it is unlikely that the legislature intended the penalty provision in section 86.13 to be the sole remedy for all types of wrongful conduct by carriers with respect to administration of workers' compensation benefits. By its terms, it applies only to delay in commencement or termination of benefits. It contemplates negligent conduct rather than the willful or reckless acts that are required to establish a cause of action under *Dolan.* In addition, no remedy is provided under section 86.13 for delay or failure to pay medical benefits. Penalty provisions for mere delay in payment or improper termination of benefits have been held in several cases not to preclude a common-law action for bad faith.

*Id.* at 744 (citations omitted). Part of the court's reasoning with respect to the allowance of this cause of action was its recognition that the insurance carrier is not the same as the employer. The *Boylan* Court commented: "This court in *Tallman v. Hanssen,* 427 N.W.2d 868, 870 (Iowa 1988), recognized that the exclusive remedy provision of our workers' compensation act is applicable only to claims against the employer and does not extend to the employer's compensation insurer." *Id.* at 743–44.

The Iowa Supreme Court then, in response to a certified question by Judge Donald O'Brien of the United States District Court for the Northern District of Iowa, extended the holding of *Boylan* to employers. *Reedy v. White Consol. Indus., Inc.,* 503 N.W.2d 601, 603 (Iowa 1993). In doing so, the court stated:

The federal court's inquiry preceded our decision in *Boylan v. American Motorists Insurance Co.,* 489 N.W.2d 742 (Iowa 1992), which, for the first time under our law, acknowledged that a civil

tort claim might be predicated on the bad-faith failure of a workers' compensation insurer to pay benefits due an injured employee under the Iowa Workers' Compensation Act. That decision, however, only clarifies some of the uncertainty that pertains to the pending federal case.

One of the bases for the *Boylan* decision was the recognition that the exclusive-remedy defense contained in Iowa Code section 85.20 (1993) is not available to insurance carriers. The present claim is against a self-insured employer. We have not yet determined whether such an employer is subject to the same liability as that which was recognized in *Boylan.*

The point of beginning for this inquiry is our decision in *Harned v. Farmland Foods, Inc.*, 331 N.W.2d 98 (Iowa 1983). In that case, we gave a strong indication that the bad-faith actions of an employer and insurance carrier with respect to denial of benefits to which an employee is entitled under the Workers' Compensation Act would not give rise to a civil liability outside of the administrative procedure for payment of workers' compensation claims. Subsequently, in *Tallman v. Hanssen*, 427 N.W.2d 868 (Iowa 1988), we recognized that the exclusive-remedy defense contained in section 85.20 only was available to an employer and did not protect a workers' compensation insurer from a bad-faith claim. In the *Boylan* case, we unequivocally approved the bringing of a bad-faith claim against a workers' compensation insurer.

Because the *Harned* case expressly recognized the availability of the exclusive-remedy defense to an *employer* with respect to claims involving nonpayment of benefits under the Workers' Compensation Act, some doubt exists as to whether *Boylan* extends to self-insured employers. That uncertainty is amplified because the dual-capacity theory of employer's liability outside the Workers' Compensation Act was rejected by this court in *Jansen v. Harmon*, 164 N.W.2d 323, 328–30 (Iowa 1969) (exclusive-remedy doctrine bars premises liability claim against employer at location other than job site when employee's purpose in being there was employment related).

Notwithstanding our rejection of the dual-capacity doctrine for finding an employer liable outside of the Workers' Compensation Act in the *Jansen* decision, we believe that the liability recognized in *Boylan* should extend to self-insured employers. A self-insured employer under the Workers' Compensation Act is not an employer who fails to secure insurance against workers' compensation liability. Without more, an employer who fails to secure insurance against such claims merely waives the protection of the act against common-law claims. Iowa Code § 87.21 (1993). To be a qualified self-insured employer under the act, it is necessary to voluntarily assume a recognized status under the workers' compensation laws as an insurer. Iowa Code § 87.4 (1987). For purposes of a bad-faith tort claim, we see no distinction between a workers' compensation insurance carrier for an employer and an employer who voluntarily assumes self-insured status under the act. Consequently, we answer the first certified question in the affirmative. *Id.* at 602–03.

### 3. Constitutionality

The Iowa Supreme Court has also confronted challenges to the constitutionality of some of the provisions of the 1912 Act. In *Suckow v. NEOWA FS, Inc.*, 445 N.W.2d 776, 778 (Iowa 1989), the court rejected challenges to the amendments to section 85.20 that give greater immunity to

employers than co-employees. The court held that there was no fundamental "right to sue" and the legislature had a rational basis under the equal protection clause for setting different liability standards for employers and co-employees. In *Gilleland v. Armstrong Rubber Co.*, 524 N.W.2d 404 (Iowa 1994), the court confronted a challenge to the disparity in treatment claims between scheduled and non-scheduled injuries that had earlier formed the basis for the concurring opinions in both *Graves* and *Simbro v. Delong's Sportswear*, 332 N.W.2d 886 (Iowa 1983). In upholding the scheduled injury provisions of the act, the *Gilleland* court traced the history of these provisions:

> Gilleland's arguments in relation to the rational basis analysis again focus on the ability of employees who suffer non-scheduled injuries to obtain compensation for loss of earning capacity while those suffering scheduled injuries cannot. He claims there is no rational basis for this distinction.
>
> Gilleland is correct that a disparity exists between the compensation for scheduled and nonscheduled injuries. Nonscheduled permanent partial disabilities are compensated by the industrial disability method which takes into account the loss of earning capacity. *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12, 14–15 (Iowa 1993). Scheduled permanent partial disabilities, on the other hand, are "arbitrarily" compensable according to the classifications of section 85.34(2) without regard to loss of earning capacity. *Id.* Determining disability in this fashion—looking only to the impairment of the employee's body function—is referred to as the functional disability method. *Id.* By using the functional disability method of section 85.34(2),
>
> > we are not concerned with the question of the extent of disability. The compensation in that event is definite-

ly fixed according to the loss of use of the particular member. *The very purpose of the schedule is to make certain the amount of compensation in the case of specific injuries and to avoid controversies ....*

> *Dailey v. Pooley Lumber Co.*, 233 Iowa 758, 760, 10 N.W.2d 569, 571 (1943) (emphasis added). As *Dailey* indicates, a rational basis exists for the application of the scheduled injury provisions of section 85.34(2). They reduce controversies through certainty of compensation. *Accord Mortimer*, 502 N.W.2d at 17; *see also Schell v. Central Eng'g Co.*, 232 Iowa 421, 425, 4 N.W.2d 399, 401 (1942) ("The [scheduled injury] statute was intended to be definite. It draws definite lines. A line is necessarily arbitrary."). Because a rational basis for the scheduled injury provisions exists, we conclude Gilleland's challenge must fail.

*Id.* at 407–08 (emphasis in original). Justice Lavorato wrote a concurrence, which three other members of a then nine-member court joined:

> "Anachronistic" is a perfect adjective to describe the scheduled injury provision because it was enacted more than eighty years ago. Just how obsolete, unfair, and medically wrong the schedules are has been described this way:
>
> > The origins of the exact numbers of weeks assigned to losses of particular members are lost in the mists of early compensation history. More recently, the American Medical Association undertook a complete reexamination of these arbitrary figures, attempting to bring to bear on them the most modern techniques of estimating the functional loss to the body as a whole represented by loss of a given member. The resulting figures show some significant deviations from traditional

schedules in the relative gravity of losses of members.

1C Arthur Larson, The Law of Workmen's Compensation § 58.11, at 10–492.92 (1993) [hereinafter Larson]. I think the scheduled injury provision is out of step with recent developments in workers' compensation law. One noted workers' compensation commentator describes the trend:

> Although in many jurisdictions the schedule award is the exclusive remedy whenever applicable, some courts· are beginning to treat the loss of specific members as amounting to percentage disabilities of larger members, or of the entire body, when this more fairly reflects the actual effect of the injury.

Larson, § 58.00, at 10–492.78. As our case authority concedes, scheduled permanent partial disabilities are arbitrarily compensable according to the classifications of sections 85.34(2)(a) to (t) without regard to the loss of earning capacity. And the only justification for this method is that it presumably makes certain the amount of compensation in the case of specific injury and it presumably avoids controversies. *Dailey v. Pooley Lumber Co.,* 233 Iowa 758, 760, 10 N.W.2d 569, 571 (1943). In deciding workers' compensation cases, we mouth the principle that the workers' compensation law is to be liberally construed in the employee's favor. *See, e.g., Teel v. McCord,* 394 N.W.2d 405, 406 (Iowa 1986). To say that the scheduled injury provision is in tune with this principle is a cruel joke.

*This court has been chipping away at the unfairness of this provision. See, e.g., Mortimer v. Fruehauf Corp.,* 502 N.W.2d 12, 17 (Iowa 1993) (a psychological condition caused or aggravated by a scheduled injury is compensable as an unscheduled injury). The legislature should complete the process we have begun by getting in step with the modern trend to make the scheduled injury provision more fair.

*Id.* at 409–10 (emphasis added).

### B. Preemption of the Breach of Fiduciary Claim

It is now fairly safe to say that intentional torts are outside the scope of the Iowa Worker's Compensation Act. *See* James R. Lawyer & Judith Ann Graves Higgs, Iowa Workers' Compensation: Law and Practice § 8.1 (3d.ed.1999). However, which intentional torts are outside the scope, or at least to what extent they are outside the scope, is not clear. The challenge in this case therefore is reconciling *Harned v. Farmland Foods, Inc.,* 331 N.W.2d 98 (Iowa 1983), *Wilson v. IBP, Inc.,* 558 N.W.2d 132 (Iowa 1996), and *Kloster v. Hormel Foods Corporation,* 612 N.W.2d 772 (Iowa 2000).

In *Harned,* the employer refused to pay for the employee's chiropractic care after his injury. 331 N.W.2d at 99. The Court said there was no indication of an intentional tort. *Id.* at 101. It held that under Iowa Code § 85.27 the employer has a right to choose medical care so long as the choice is reasonable, and the mere fact that the employee disagreed with it did not make it unreasonable. *Id.*

In *Wilson,* the company nurse lied to an employee's doctor about having a videotape of the employee "messing around" and not following his work restrictions. 558 N.W.2d at 136. The employee sued, claiming that the company nurse breached her fiduciary duty to him. *Id.* The court distinguished *Harned* as simply a claim for failure to provide requested care, and held that a claim for breach of fiduciary duty, as an intentional tort and regardless of its merit, is only cognizable outside the scope of the workers' compensation act. *Id.* at 137–38. The court stated, "Although there

was some dispute over IBP's habit of practicing 'conservative care,' the gravamen of Wilson's complaint involves alleged intentional torts committed by Arndt [the company nurse] in the period preceding and during his treatment. Thus, this case is not a simple issue of dissatisfaction with care as defendants suggest." *Id.*

In *Kloster*, a jury found that an employee's manager intentionally and improperly interfered with his medical care. 612 N.W.2d at 773. Without mentioning *Wilson*, the court held that the claim was preempted by the workers' compensation act and vacated the verdict. *Id.* at 774–75. Its reasoning was that the essence of the plaintiff's claim was that his doctor's medical judgment was compromised and that it was therefore just a claim for dissatisfaction of medical care for which Iowa Code § 85.27 provided relief. *Id.* at 775.

■ Swift argues that it did not breach its fiduciary duty to Phillips and that Phillips' claim is really just a claim for dissatisfaction of medical care like in *Kloster*. Phillips argues that Welton, like the IBP nurse in *Wilson*, breached a fiduciary duty and thus his case is like *Wilson* and not *Kloster*. The Court must agree with Phillips. In *Harned*, there was simply no intentional tort. In *Kloster*, there was an intentional tort but it was not cognizable outside the realm of the workers' compensation scheme. And in *Wilson*, there was an intentional tort, but it was committed by a fiduciary. The only difference between *Kloster* and *Wilson*—that the Court sees anyway-is that the defendant in *Wilson* owed a fiduciary duty to the plaintiff. Swift admits that Welton owed Phillips a

fiduciary duty.[1] In light of this, the Court fails to see how this case differs from *Wilson*. Therefore, like the claim in *Wilson*, Phillips' breach of fiduciary duty claim is cognizable, if at all, outside the workers' compensation act. *See Wilson*, 558 N.W.2d at 138.

## C. Breach of the Fiduciary Duty

■ Phillips alleges that Welton, and therefore Swift,[2] breached her fiduciary duty to him in at least four instances. First, Swift placed Phillips on the kill floor on October 5, 1998. Phillips contends this the environment on the kill floor violated his work restrictions. Second, Phillips claims that while on the kill floor he was required to use his right arm in direct violation of his work restrictions. Third, Phillips claims that he was placed on the kill floor without proper protection for his wound. Fourth, Phillips claims that despite the appearance of an infection on October 9, 1998 and a gap opening in his wound on October 12, 1998, Swift kept him on the kill floor. On the basis of these allegations and the factual record supporting them, the Court finds that a reasonable jury could conclude that Swift breached a fiduciary duty to Phillips.

## D. Punitive Damages

■ Swift also argues that Phillips has failed to submit sufficient evidence with regard to his claim for punitive damages. In order to receive punitive damages in Iowa a plaintiff must demonstrate that the conduct of the defendant "constituted willful and wanton disregard for the rights of others." Iowa Code § 668A.1. Phillips

---

**1.** Swift admits that a fiduciary relationship existed between its medical department and Phillips. Def.'s Resp. to Pl.'s Statement of Undisputed [sic] Facts ¶ 51a.

**2.** Phillips appears to claim that Swift is responsible for any breach of a fiduciary duty

committed by Welton under the theory of respondent superior. Swift does not resist this theory of liability. In fact, the same was done in *Wilson*. *See Wilson*, 558 N.W.2d at 136.

submits affidavits of former Swift employees which generally state that injured Swift employees were: (1) assigned to jobs that violated work restrictions; (2) sent home instead of to the emergency room when injured; (3) refused requests to see doctors; (4) treated with contempt and hostility when injured and assigned certain jobs as a form of punishment; and (5) terminated because of work related injuries. The affidavits also suggest that Welton lied to treating doctors about patients' injuries, told doctors that the injured employee was a whiner or complainer, and tried to change the work restrictions of the employee. In addition, Phillips submits copies of Swift's 1998 and 1999 management incentive programs which show that monetary bonuses were based in part on reducing workers' compensation costs and lost work time resulting from injuries.

■ Swift argues that these affidavits are not sufficient to withstand a summary judgment motion because they consist of evidence that would be inadmissible at trial. It correctly points out that a district court cannot consider evidence that would be inadmissible at trial in making its determination on a summary judgment motion. *See Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993). However, the Court has reviewed the affidavits and determines that while parts of them are inadmissible, there is sufficient evidence even without those parts to make summary judgment on Phillips' claim for punitive damages inappropriate at this point.

## IV. CONCLUSION

Defendant's motion for summary judgment (Clerk's No. 30) is **DENIED.**

**IT IS SO ORDERED.**